UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CROSS FIRE & SECURITY CO., INC. and NORTH AMERICAN FIRE HOLDINGS, LLC, *doing business as* ALTUS FIRE & LIFE SAFETY,

Plaintiffs,

-v.-

ALAN DOORLY, CHRIS NEIL, and EMPIRE FIRE ALARM SPECIALIST CO. INC.,

Defendants.

25 Civ. 4846 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

At its core, this lawsuit alleges that two former employees of a fire safety company benefited from the sale of that company and then used the company's confidential information and trade secrets to start a competing business. Plaintiffs are Cross Fire & Security Co., Inc. ("Cross Fire") and North American Fire Holdings, LLC, which does business as Altus Fire & Life Safety ("Altus"). They have sued their former employees, Alan Doorly and Chris Neil (the "Individual Defendants"), as well as the entity that the Individual Defendants currently work for and own, Empire Fire Alarm Specialist Co. Inc. ("Empire Fire," and together with the Individual Defendants, "Defendants"), for various theft of trade secrets, false advertising, and common law violations.

Before the Court now is Defendants' motion (i) to dismiss all or part of the action under Federal Rule of Civil Procedure 12(b) or (ii) to stay the action under either the *Colorado River* abstention doctrine or the Court's inherent powers. For the reasons set forth below, the Court denies that motion in substantial part. Specifically, the Court grants Defendants' motion to dismiss

Plaintiffs' conversion claim, but denies Defendants' motion to dismiss Plaintiffs' other claims or to stay the action.

## BACKGROUND[1]

### A. Factual Background

#### 1. The Parties

Plaintiff Cross Fire is a New York fire and life safety company that services customers in the New York City area, particularly in Manhattan and the Bronx. (Compl. ¶ 12). Cross Fire is a wholly owned subsidiary of Plaintiff Altus, a Delaware limited liability company with a principal place of business in

[1] This Opinion draws its facts from the Complaint ("Compl." (Dkt. #33)), the well-pleaded allegations of which are taken as true for purposes of this Opinion. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). The Court also relies, as appropriate, on certain of the exhibits attached to the Complaint, each of which is incorporated by reference in the Complaint. *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).

In addition, because a court analyzes a motion to dismiss or stay under *Colorado River* "as a motion to dismiss [under] Rule 12(b)(1) of [the] Federal Rules of Civil Procedure," *Iacovacci* v. *Monticciolo*, No. 18 Civ. 7984 (JFK), 2019 WL 2074584, at *3 (S.D.N.Y. May 9, 2019) (internal quotation marks omitted) (quoting *Stahl York Ave. Co., LLC* v. *City of New York*, No. 14 Civ. 7665 (ER), 2015 WL 2445071, at *7 (S.D.N.Y. May 21, 2015), *aff'd*, 641 F. App'x 68 (2d Cir. 2016) (summary order)), the Court also may consider extrinsic evidence in resolving that component of Defendants' motion, *see, e.g.*, *Nicholas* v. *Trump*, 433 F. Supp. 3d 581, 584 n.2 (S.D.N.Y. 2020); *Carter* v. *HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016)). Accordingly, the Court draws jurisdictional facts from the Declarations of Michael C. Rakower ("Rakower Decl." (Dkt. #44)) and Alison Sher ("Sher Decl." (Dkt. #51)), and the exhibits attached thereto. Included as exhibits are filings in a related action brought in Delaware Chancery Court, referred to here as the "Delaware Action" and discussed further in this Opinion, of which filings the Court may take judicial notice. *See Glob. Network Commc'ns, Inc.* v. *City of New Yrok*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (internal quotation marks omitted) (quoting *Int'l Star Class Yacht Racing Ass'n* v. *Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998))).

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss or to stay as "Def. Br." (Dkt. #43); to Plaintiffs' memorandum of law in opposition to Defendants' motion as "Pl. Opp." (Dkt. #50); and to Defendants' reply memorandum of law as "Def. Reply" (Dkt. #54).

New York. (*Id.* ¶ 13). Altus operates a portfolio of fire and life services companies, including Cross Fire. (*Id.*). Altus acquired Cross Fire as the first company in its portfolio in May 2021. (*Id.*).[2]

Defendant Alan Doorly, a New York resident, worked for Cross Fire for nearly 30 years, most recently as General Manager. (Compl. ¶ 14). Defendant Chris Neil worked for Cross Fire for approximately 20 years, most recently as Manager of Business Development. (*Id.* ¶ 15). Mr. Doorly and Mr. Neil are now principals and owners of Defendant Empire Fire. (*Id.* ¶¶ 14-15).

**2. The Individual Defendants' Post-Acquisition Employment at Cross Fire and Their Entry into Various Agreements**

When Cross Fire's founders, which included Mr. Doorly, sold their interests in Cross Fire in May 2021, they agreed to continue serving as officers of Cross Fire for two years, until May 2023. (Compl. ¶ 3). In connection with the Cross Fire acquisition, Mr. Doorly received $3 million and equity in North American LP, Cross Fire's new owner. (*Id.* ¶¶ 35-36). As an equity holder in North American LP, Mr. Doorly became a party to North American LP's limited partnership agreement, or "LPA." (*Id.* ¶ 68; Rakower Decl., Ex. 1 (LPA)).

Thereafter, in February 2022, the Individual Defendants each entered into Incentive Unit Grant Agreements ("Incentive Agreements"), under which they received additional equity in North American LP in exchange for, among

---

2 In May 2021, nonparty North American Fire Ultimate Holdings LLC ("North American LLC"), Altus's owner at the time, acquired Cross Fire. (Compl. ¶¶ 1, 3). North American LLC was later reorganized as North American Fire Ultimate Holdings, LP ("North American LP"). (*Id.* ¶ 36). In July 2024, North American LP sold its portfolio, including Cross Fire, to a third party. (*Id.*). North American LP no longer owns Altus and Cross Fire. (*Id.* ¶¶ 36, 68).

other things, their agreement to various restrictive covenants and contractual obligations. (Compl. ¶¶ 74-75; *see also* Rakower Decl., Ex. 2 ("Doorly Incentive Agreement"); *id.*, Ex. 3 ("Neil Incentive Agreement")). In addition to the covenants in the Incentive Agreements, the Individual Defendants were bound by an Employee IP and Confidentiality Agreement and Altus's Employee Handbook, each of which required them to safeguard the confidentiality of Cross Fire's trade secrets and other information. (*Id.* ¶¶ 14-15). At this time, the Individual Defendants were also both parties to the LPA, which included its own confidentiality provision. (LPA § 3.13).

In or around January 2023, Mr. Doorly was promoted to General Manager of Cross Fire, its top position. (Compl. ¶¶ 37-38). Mr. Doorly in turn promoted Mr. Neil to lead Cross Fire's business development team. (*Id.* ¶¶ 4, 40-41). Plaintiffs allege that following Cross Fire's sale in May 2021, the Individual Defendants, while continuing to work at Cross Fire, began plotting to form a competing business, Empire Fire, that would use Cross Fire's business information and target Cross Fire's existing employees and customers. (*Id.* ¶ 5; *see also id.*, Ex. K).

### 3. Dispute Resolution Provisions in the LPA and the Incentive Agreements

The LPA and the Incentive Agreements also included certain provisions regarding dispute resolution that are potentially relevant to the instant motion. Section 11(g) of the Incentive Agreements provides that "any Action arising under or relating to this Agreement or any other Transaction Document or any breach or threatened breach hereof" would be resolved by arbitration, "[e]xcept

as expressly determined and specified in writing by the Controlling Investor(s)," in which case the matter would be resolved in the courts of Delaware. (Doorly Incentive Agreement § 11(g); Neil Incentive Agreement § 11(g)).

Separately, Section 14.9(a) of the LPA specifies three categories of "Covered Matters" that are subject to arbitration in New York:

> "[1] any Action (whether sounding in contract, tort or statute) concerning the construction, validity or interpretation of this Agreement or any other Transaction Document, … [2] any Action that may be based upon, arise out of or relate to this Agreement or any other Transaction Document or any breach or threatened breach hereof or any of the transactions contemplated hereby or thereby, … and [3] any action (whether sounding in contract, tort, or statute) (i) that is derivative in nature, (ii) brought on behalf of the Partnership or any of its Subsidiaries, (iii) asserting a claim of breach of any duty (including any fiduciary duty) owed, or alleged to be owed, by any Partner, Supervisor, Officer or any other Person bound by or subject to this Agreement or any other Transaction Document, (iv) asserting a claim for a bad faith violation of the implied contractual covenant of good faith and fair dealing or (v) asserting a claim relating to the organization or internal affairs of the Partnership or any of its Subsidiaries[.]

(LPA § 14.9(a)). This arbitration requirement was subject to the same carveout for waiver by the Controlling Investors, invocation of which would enable Covered Matters to be brought in the courts of Delaware. (*Id.* § 14.9(f)).

Potentially relevant to the dispute resolution provisions, the LPA also provides that "[n]othing in this Agreement shall in any way affect, limit or modify any … employee's … obligations (including duties) under any … confidentiality agreement, noncompete agreement, nonsolicit agreement or any similar agreement with the Partnership or any of its Subsidiaries." (LPA

§ 5.7(d)). And a different section provides that only certain sections of the LPA "shall survive … notwithstanding any termination of this Agreement or the dissolution of the Partnership." (*Id.* § 14.21). That provision lists surviving terms and does not include Section 14.9. (*See id.*).

**4. Cross Fire's Confidential and Trade Secret Information**

Over the course of its existence, Cross Fire has developed and maintained commercially valuable information, including a roster of clients, contact information, details regarding client-specific pricing and contracts, and technical information about clients' fire and life safety systems. (Compl. ¶ 24). It also maintains information concerning its employees, including details about their compensation and their relationships with current or potential clients. (*Id.*). Cross Fire uses this information to run and grow its business. (*Id.* ¶ 26).

Recognizing the essential nature of this information, and as discussed above, Cross Fire requires employees to sign various confidentiality agreements as a condition of employment. (Compl. ¶ 27). For example, prior to 2023, the Individual Defendants entered into Employee Confidentiality Agreements, and in 2023, they assented to the Altus Employee Handbook, which also contained a confidentiality agreement. (*Id.* ¶¶ 58-67). Plaintiffs took additional measures with respect to their highest ranking executives, including Mr. Doorly and Mr. Neil, by including restrictive covenants in equity and option agreements. (*Id.* ¶¶ 68-78).

### 5. The End of the Individual Defendants' Employment and Their Alleged Competition with Cross Fire

According to Plaintiffs, the Individual Defendants took steps shortly after their promotions in January 2023 to form their own competing business, Empire Fire. (Compl. ¶ 42). They first acquired a domain name, EFASNYC, that Plaintiffs claim bore some resemblance to Cross Fire's domain of CFSNYC. (*Id.* ¶¶ 43-48). More troublingly, Plaintiffs allege that from May 30, 2023, to June 8, 2023, while still employed by Cross Fire, the Individual Defendants compiled confidential and commercially valuable trade secret information about Cross Fire that Empire Fire could and did use to launch its competing business. (*Id.* ¶¶ 50-56).

Plaintiffs allege that the Individual Defendants also took steps to undermine Cross Fire's business while still employed there. For example, in Fall 2023, Cross Fire was invited by a firm called Tower Fire to bid on a maintenance subcontract for Amtrak New York Penn Station (the "Penn Station Project"). (Compl. ¶¶ 81-83). The Individual Defendants represented Cross Fire in the bidding process. (*Id.* ¶ 82). But instead of seeking to win the project for Cross Fire, the Individual Defendants disparaged Cross Fire and Altus to Tower Fire's owner and submitted a bid for the Penn Station Project on behalf of Empire Fire. (*Id.* ¶¶ 82-93).

In late 2023, the Individual Defendants ceased being employees of Cross Fire. On October 4, 2023, Mr. Neil announced his resignation from Cross Fire, effective October 18, 2023. (Compl. ¶ 87). Later that month, on October 30, 2023, Mr. Doorly announced his resignation. (*Id.* ¶ 94). Altus allowed Mr.

Doorly to stay on past November 10, 2023, while he tried to renegotiate the terms of his separation. (*Id.* ¶¶ 104-105).

Plaintiffs allege that during that time, the Individual Defendants gathered more of Cross Fire's trade secrets. On November 8, 2023, Mr. Doorly allegedly emailed a suite of Cross Fire documents to his personal email account. (Compl. ¶¶ 96-99). Mr. Doorly was concurrently emailing Cross Fire customers on behalf of Empire Fire. (*Id.* ¶¶ 100-101). Simultaneously, Mr. Neil was soliciting Cross Fire customers on LinkedIn, and Empire Fire was taking calls with and submitting competing proposals to Cross Fire customers. (*Id.* ¶¶ 102, 114-121). Finally, on or prior to December 18, 2023, the Individual Defendants allegedly shared with Empire Fire a line-by-line account of Cross Fire's costs and profits for a project known as the "270 Park Ave Breakout." (*Id.* ¶ 123). All this time, the Individual Defendants were recruiting Cross Fire personnel to join Empire Fire. (*Id.* ¶¶ 131-132).

After resigning, Mr. Doorly attempted to renegotiate the terms of his separation with Altus, including his one-year noncompete. (Compl. ¶¶ 104-106). During these negotiations, Plaintiffs conducted an investigation and learned about the Individual Defendants' alleged misconduct, including Empire Fire's bid on the Penn Station Project. (*Id.* ¶¶ 105-109). Upon learning of this misconduct, Altus terminated Mr. Doorly for cause on December 27, 2023, and directed him to return all property and materials containing Plaintiffs' confidential information. (*Id.* ¶¶ 110-111). The Individual Defendants allegedly failed to return any such materials. (*Id.* ¶ 112).

Following their departure from Cross Fire, Defendants allegedly continued to use Cross Fire's protected information for Empire Fire's benefit. This included hiring seven more Cross Fire employees and systematically soliciting Cross Fire customers. (Compl. ¶¶ 133-163). In addition, Plaintiffs allege that Defendants fabricated at least two documents designed to look like Engineering News-Record ("ENR") press releases that they posted on LinkedIn and emailed to thousands of businesses and industry participants, including Cross Fire customers. (*Id.* ¶¶ 164-173). These purported releases contain allegedly false statements, including that Cross Fire was not licensed and that customers who continued to use Cross Fire would be in violation of the Fire Code and risked voiding their insurance coverage. (*Id.* ¶¶ 176-180).

## B. Procedural Background

### 1. The Delaware Action

On January 10, 2024, shortly after Altus's termination of Mr. Doorly, North American LP commenced an action in Delaware (the "Delaware Action"), raising four causes of action. (Compl. ¶ 124; *see generally* Rakower Decl., Ex. 5 (Delaware Action First Amended Complaint, or "Del. FAC")). Count I alleges that Mr. Doorly breached the restrictive covenants in his Incentive Agreement. (Del. FAC ¶¶ 60-68). Count II asserts that Mr. Doorly breached the implied covenant of good faith and fair dealing under his Incentive Agreement. (*Id.* ¶¶ 69-76). Count III seeks a declaratory judgment in connection with Mr. Doorly's breach of those same covenants. (*Id.* ¶¶ 77-84).

Count IV alleges that Mr. Doorly tortiously interfered with North American LP's prospective contractual relations. (*Id.* ¶¶ 85-88).

The First Amended Complaint in the Delaware Action makes various allegations about Mr. Doorly secretly establishing Empire Fire, stealing files from Cross Fire, and competing with Cross Fire for existing and potential clients. (Del. FAC ¶¶ 32-59). It also names specific Cross Fire clients and potential clients with whom Doorly allegedly interfered. (*Id.* ¶¶ 38-42, 47, 52-54, 57-58). Finally, it alleges that Mr. Doorly solicited Cross Fire employees to join Empire Fire. (*Id.* ¶¶ 55-56). In other words, there is a degree of overlap between the factual allegations in the Delaware Action and those in this matter.

In Delaware, Mr. Doorly moved to dismiss the First Amended Complaint, a motion that the Delaware Court of Chancery granted on March 7, 2025. *See N. Am. Fire Ultimate Holdings, LP* v. *Doorly*, C.A. No. 2024-0023-KSJM, 2025 WL 736624, at *6 (Del. Ch. Mar. 7, 2025) ("*N. Am. LP I*"), *rev'd*, No. 142, 2025, 2026 WL 274647 (Del. Feb. 3, 2026). On North American LP's contract claims, the Court of Chancery determined that the Incentive Agreement was unenforceable, so North American LP could not maintain their claims for breach. *Id.* at *2-5.

The Court of Chancery also dismissed North American LP's tortious interference claim. *N. Am. LP I*, 2025 WL 736624, at *5-6. The court reasoned that such a claim was not subject to Section 14.9 of the LPA or Section 11(g) of the Incentive Agreement. *Id.* at *6. And because those provisions were the only

basis for the Delaware court's personal jurisdiction over the tort claim against Mr. Doorly, the court concluded that it lacked jurisdiction to consider that claim. *Id.*

North American LP appealed the Court of Chancery's decision, but only as to North American LP's contract-based claims. *N. Am. Fire Ultimate Holdings, LP* v. *Doorly*, No. 142, 2025, 2026 WL 274647, at *1 (Del. Feb. 3, 2026) ("*N. Am. LP II*"). On February 3, 2026, the Delaware Supreme Court reversed the Court of Chancery's decision, meaning that North American LP's contract claims remain live in the Delaware Action. *Id.* at *2, 4.[3]

**2. The Instant Action**

On June 9, 2025, about three months after the Court of Chancery's initial dismissal of the Delaware Action, Altus, under new ownership, filed the Complaint in this action. (Dkt. #1).[4] In addition to Mr. Doorly, this action named Mr. Neil and Empire Fire as Defendants. (*Id.*). Its factual allegations mostly mirror those made in the Delaware Action, except Plaintiffs also raise new allegations regarding the allegedly false ENR press releases. (Compl. ¶¶ 164-180). At certain points in the Complaint, Plaintiffs note that certain of

---

3 After remand of the Delaware Action to Chancery Court, North American LP moved to stay the matter pending resolution of the instant case. *See generally* Plaintiff's Motion to Stay Proceedings, *N. Am. Fire Ultimate Holdings, LP* v. *Doorly*, No. 2024-0023-KSJM, 2026 WL 1083130 (Del. Ch. Apr. 16, 2026). The stay motion remains pending as of the date of this Opinion, and this Court expresses no views on its merits.

4 The Complaint as originally filed was placed under seal. (Dkt. #1; *see* Dkt. #32 (Sealing Order)). This Opinion relies on a redacted, public version of the Complaint, which was filed on September 24, 2025. (Dkt. #33).

Individual Defendants' confidentiality obligations appear in their Incentive Agreements and the LPA. (*Id.* ¶¶ 69, 78, 191, 198, 248).

The Complaint asserts nine causes of action under federal, state, and common law. (Compl. ¶¶ 182-284). Specifically, Plaintiffs allege that (i) all Defendants violated the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 (*id.* ¶¶ 182-203); (ii) all Defendants engaged in false advertising under the Lanham Act, 15 U.S.C. § 1125(A), by distributing fabricated ENR releases (Comp. ¶¶ 204-211); (iii) all Defendants engaged in false advertising under New York General Business Law § 350 based on the same conduct (*id.* ¶¶ 212-222); (iv) all Defendants published false and defamatory statements about Plaintiffs in the fabricated ENR releases (*id.* ¶¶ 223-239); (v) Mr. Doorly and Mr. Neil were faithless servants to Cross Fire and Altus (*id.* ¶¶ 240-251); (vi) Mr. Doorly and Mr. Neil breached fiduciary duties that they owed to Cross Fire and Altus (*id.* ¶¶ 252-257); (vii) all Defendants engaged in unfair competition (*id.* ¶¶ 258-263); (viii) all Defendants tortiously interfered with Plaintiffs' business relations (*id.* ¶¶ 264-273); and (ix) all Defendants engaged in conversion regarding Plaintiffs' confidential and trade secret business information (*id.* ¶¶ 274-284). In connection with these violations, Plaintiffs seek a permanent injunction, forfeiture of certain compensation that the Individual Defendants received while working for Cross Fire, compensatory damages, punitive damages, and attorneys' fees. (*Id.* at 57-58).

On July 11, 2025, Defendants filed a pre-motion letter regarding an anticipated motion to stay the instant case pending the result of the Delaware

Action. (Dkt. #18). In their letter, Defendants attempted to preserve their right to move to dismiss until after the Court's decision on a motion to stay. (*Id.*). Plaintiffs responded on July 16, 2025. (Dkt. #19). The Court then explained that it would consider a motion to stay either after Defendants answered or in tandem with a motion to dismiss. (Dkt. #20).

On July 24, 2025, Defendants filed an updated pre-motion letter. (Dkt. #21). In that letter, Defendants registered their intent to move to stay the case under the *Colorado River* abstention doctrine pending the resolution of the Delaware Action. (*Id.*). In addition to their *Colorado River* claims, Defendants intended to move to dismiss four of the nine counts (Counts I, III, VIII, and IX) for failure to state a claim. (*Id.*). Plaintiffs responded on July 29, 2025. (Dkt. #22). The Court held a pre-motion conference on September 2, 2025. (*See* September 2, 2025 Minute Entry).

After the pre-motion conference, the parties reported to the Court that they could not reach an agreement regarding a schedule for motion practice and discovery. (Dkt. #24). Specifically, Defendants hoped to stay all discovery, while Plaintiffs wished for discovery to commence immediately. (Dkt. #24). Ultimately, the Court determined that discovery would commence, but only as to Counts II-IV, which had no relation to the Delaware Action, and it scheduled briefing on Defendants' anticipated motion. (Dkt. #25-26).

On October 29, 2025, Defendants filed a letter with the Court stating that they "recently became aware of a forum selection clause in a partnership agreement," presumably Section 14.9(a) of the LPA, "that appears to bind

Plaintiffs to arbitrate their dispute in New York or litigate it in a Delaware court." (Dkt. #38). Consequently, Defendants requested limited jurisdictional discovery on the matter. (*Id.*). Plaintiffs responded the next day. (Dkt. #39). In their response, Plaintiffs noted that Defendants had known about and litigated Section 14.9(a) of the LPA for years. (*Id.*). The Court, despite being "troubled" by Defendants' apparently misleading representation about their recent discovery of the LPA, nonetheless granted Defendants' request for limited jurisdictional discovery on November 5, 2025. (Dkt. #45).

On October 31, 2025, while the jurisdictional discovery question was pending, Defendants filed the instant motion to dismiss or stay, along with supporting papers. (Dkt. #42-44). Defendants' motion adopts the arguments they raised in their pre-motion letter, namely, that the Court should dismiss four of Plaintiffs' claims under Rule 12(b)(6) and stay the case under either *Colorado River* or the Court's inherent powers. (Def. Br. 9-25). On the *Colorado River* argument, Defendants are unclear about whether they seek a complete stay of this action, or whether they only seek a stay of the six causes of action that relate to the Delaware Action. (*See id.* at 17-22 (arguing that the Court should abstain "from Adjudicating Claims Arising from the Same Nucleus of Fact Underlying [the] Delaware Action," but not discussing the issue specifically in the analysis section)).

But Defendants also raise a new argument, which stems from Defendants' earlier jurisdictional discovery request. Specifically, Defendants argue that the Court lacks jurisdiction over the entire matter because Section

14.9 of the LPA requires the parties to arbitrate their disputes in New York or raise them in Delaware courts. (Def. Br. 8-9). Plaintiffs filed their opposition to Defendants' motion on December 1, 2025. (Dkt. #50-51). Defendants then filed their reply on December 19, 2025, thus concluding briefing on the instant motion. (Dkt. #54).

While this motion has been pending, the parties have proceeded with discovery on Counts II-IV. (*See* Dkt. #61-62, 69-70). On May 12, 2026, Defendants informed the Court of their intention to move for sanctions or to dismiss Plaintiffs' defamation claim based on certain discovery. (Dkt. #66). On May 20, 2026, the Court denied Defendants' request for sanctions and explained that Defendants' arguments were better suited for a summary judgment motion. (Dkt. #68).

This Opinion resolves Defendants' motion to dismiss or stay. It begins by discussing Defendants' arguments for dismissal due to Section 14.9(a) of the LPA. It then considers Defendants' arguments for dismissal for failure to state a claim. It concludes by assessing Defendants' request for a stay under either *Colorado River* or the Court's inherent powers.

## DISCUSSION

### A. The Court Denies Defendants' Motion to Dismiss the Complaint Based on Section 14.9(a) of the LPA

The Court first addresses whether Section 14.9(a) of the LPA, which requires that certain disputes be arbitrated in New York or brought in the courts of Delaware, mandates dismissal of this case. Notably, Section 14.9(a)

is neither a pure forum selection clause nor a pure arbitration provision. (*See* LPA § 14.9(a)). It is thus somewhat unclear whether Defendants' motion is more properly analyzed as one to enforce a forum selection clause or one to compel arbitration.[5] For completeness, and given certain similarities in the analyses, the Court discusses both.

**1. Applicable Law**

**a. Motions to Enforce Forum Selection Clauses**

The Second Circuit has explained that "a defendant may seek to enforce a forum selection clause under Rule 12(b)," but it has withheld specifying the precise subsection of Rule 12(b) that governs such a motion. *TradeComet.com LLC* v. *Google, Inc.*, 647 F.3d 472, 478-79 (2d Cir. 2011); *see also AIG Mex. Seguros Interamericana, S.A. de C.V.* v. *M/V Zapoteca*, 844 F. Supp. 2d 440, 442 (S.D.N.Y. 2012) ("In the Second Circuit, district courts have treated a pre-trial motion based on the presence of a forum selection clause as a Motion to Dismiss under either [Rule]12(b)(3) or 12(b)(6)." (collecting cases)); *Kelso Enters. Ltd.* v. *M/V Diadema*, No. 08 Civ. 8226 (SAS), 2009 WL 1788110, at *2 n.24 (S.D.N.Y. June 23, 2009) ("Courts in this circuit have considered dismissals pursuant to forum selection clauses under Rules 12(b)(1), 12(b)(3), and 12(b)(6)."). Still, "[t]he enforcement of a forum selection clause through a Rule

5 Defendants frame their motion as one to dismiss for lack of jurisdiction, not one to compel arbitration. (*See* Def. Br. 8-9). But the Court finds it useful to also consider the motion as one to compel arbitration because Defendants seek to enforce Section 14.9(a) of the LPA, which discusses when a party must arbitrate a dispute.

12(b) motion to dismiss is a well-established practice." *TradeComet.com LLC*, 647 F.3d at 475.

Dismissing a claim based on a forum selection clause involves a "four-part analysis." *Martinez* v. *Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014); *accord Home Mkt. Foods, Inc.* v. *Swiss Re Corp. Sols. Capacity Ins. Corp.*, No. 25 Civ. 941 (AT), 2026 WL 550188, at *2 (S.D.N.Y. Feb. 26, 2026). *First*, the court considers "whether the clause was reasonably communicated to the party resisting enforcement." *Martinez*, 740 F.3d at 217 (internal quotation marks omitted) (quoting *Phillips* v. *Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007)). *Second*, the court asks "whether the clause 'is mandatory or permissive.'" *Id.* (quoting *Phillips*, 494 F.3d at 383). *Third*, the Court considers "whether the claims and parties involved in the suit are subject to the forum selection clause." *Id.* (internal quotation marks omitted) (quoting *Phillips*, 494 F.3d at 383).

If these first three factors are met, the forum selection clause is "presumptively enforceable." *Martinez*, 740 F.3d at 217 (internal quotation marks omitted) (quoting *Phillips*, 494 F.3d at 383). But under the *fourth* factor, "[a] party can overcome this presumption ... by ... 'making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" *Id.* (quoting *Phillips*, 494 F.3d at 383-84).

**b. Motions to Compel Arbitration**

Motions to compel arbitration are governed by a somewhat similar standard. Under the Federal Arbitration Act, a party to an arbitration agreement can petition the appropriate federal district court for an order compelling arbitration when its counterparty "fail[s], neglect[s], or refus[es] ... to arbitrate under a written agreement for arbitration." 9 U.S.C. § 4. The court ruling on such a motion must decide "[i] whether the parties agreed to arbitrate, and, if so, [ii] whether the scope of that agreement encompasses the claims at issue." *Holick* v. *Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Bank Julius Baer & Co., Ltd.* v. *Waxfield Ltd.*, 424 F.3d 278, 281 (2d Cir. 2005), *abrogated on other grounds by Granite Rock Co.* v. *Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010)).

**2. Empire Fire Is Not Bound by Section 14.9(a)**

As a preliminary matter, the Court notes that Empire Fire is not a party to the LPA, so claims against it need not be arbitrated. *See, e.g.*, *Shenzhen Xingchen Xuanyuan Indus. Co. Ltd.* v. *Amazon.com Servs. LLC*, 735 F. Supp. 3d 453, 462 (S.D.N.Y. 2024) ("It has long been settled that arbitration is a matter of contract and that, therefore, a party cannot be compelled to arbitrate issues that a party has not agreed to arbitrate." (internal quotation marks omitted) (quoting *Isaacs* v. *OCE Bus. Servs., Inc.*, 968 F. Supp. 2d 564, 567 (S.D.N.Y. 2013))); *Peerless Imps., Inc.* v. *Wine, Liquor & Distillery Workers Union Loc. One*, 903 F.2d 924, 927 (2d Cir. 1990) ("Because the duty to arbitrate is of contractual origin, 'a party cannot be required to submit to arbitration any

dispute which he has not agreed so to submit.'" (quoting *AT&T Techs., Inc.* v. *Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986))). Accordingly, Section 14.9(a) of the LPA does not mandate dismissal of Plaintiffs' claims against Empire Fire.

**3. Section 14.9(a) Does Not Mandate Dismissal of the Claims Against the Individual Defendants**

Unlike Empire Fire, the Individual Defendants entered into the LPA when they became partners in North American LP. Nonetheless, Defendants' arguments for dismissal fare no better against the Individual Defendants. The question here is similar whether the Court views Section 14.9(a) of the LPA as a forum selection clause or an arbitration provision. The key issue is "whether the claims and parties involved in the suit are subject to the forum selection clause," *Martinez*, 740 F.3d at 217 (internal quotation marks omitted) (quoting *Phillips*, 494 F.3d at 383), or, similarly, "[i] whether the parties agreed to arbitrate, and, if so, [ii] whether the scope of that agreement encompasses the claims at issue," *Holick*, 802 F.3d at 394 (internal quotation marks omitted) (quoting *Bank Julius Baer & Co., Ltd.*, 424 F.3d at 281).

Defendants argue that this dispute is a "Covered Matter" under Section 14.9(a) of the LPA. (Def. Br. 8-9). According to them, this dispute "concerns the rights of [North American] LP, the obligations of its partners, and the terms of the LPA." (*Id.* at 8). As a result, Plaintiffs' claims must be arbitrated, given the absence of certain circumstances that would allow Plaintiffs to bring their claims in the courts of Delaware. (*Id.* at 9 (citing LPA § 14.9(f))). Plaintiffs offer

two broad retorts as to why Section 14.9(a) does not govern here. The Court is persuaded by the second, but not the first.

**a. The Individual Defendants Are Bound by Section 14.9(a)**

*First*, Plaintiffs focus on the parties litigating in this Court. They note that North American LP no longer owns Cross Fire and Altus. (Pl. Opp. 11-12 (citing Compl. ¶¶ 36, 68)). And they add that Mr. Doorly and Mr. Neil are no longer partners in North American LP. (*Id.*). For this latter proposition, Plaintiffs rely on a brief submitted by Mr. Doorly in the Delaware Action, and a provision of Mr. Neil's Incentive Agreement that provides for the repurchase of vested units and forfeiture of unvested units in North American LP upon separation. (*Id.* (first citing Sher Decl., Ex. 2 ("Doorly Del. Reply") at 24-25; then citing Neil Incentive Agreement § 3)). Plaintiffs conclude that because "no party here is subject to the agreement to arbitrate in Section 14.9," that agreement cannot apply here. (*Id.* at 11).

On this record, the Court disagrees with Plaintiffs. As a matter of law, whether the parties are *currently* signatories to the forum selection clause matters little. Instead, what matters is whether the parties were subject to Section 14.9 when the events giving rise to the current claim occurred. *See, e.g.*, *Weingard* v. *Telepathy, Inc.*, No. 05 Civ. 2024 (MBM), 2005 WL 2990645, at *3 (S.D.N.Y. Nov. 7, 2005) ("[P]arties to a contract are bound by that contract's forum selection clause even after the contract has expired, where … the plaintiff's claims involve rights arising out of the contract[.]" (collecting cases)); *George V Eatertainment S.A.* v. *Elmwood Ventures LLC*, No. 22 Civ.

8047 (JLR), 2023 WL 2403618, at *9 (S.D.N.Y. Mar. 8, 2023) ("District courts in other cases have similarly enforced forum-selection clauses in agreements where those agreements had otherwise expired or been terminated." (collecting cases)).[6]

From the record, it seems that at least some of the misconduct alleged here occurred before December 2023 (*see, e.g.*, Compl. ¶¶ 82-93 (Individual Defendants submitting a competing bid on the Penn Station Project), 96-99 (Mr. Doorly emailing documents to himself), 100-101 (Mr. Doorly emailing Cross Fire customers on behalf of Empire Fire)), a time when North American LP owned Plaintiffs (*id.* ¶ 36 (alleging that North American LP sold Plaintiffs in July 2024)), and counted the Individual Defendants among its Partnership (*id.* ¶¶ 110-111 (alleging that Altus terminated Mr. Doorly in December 2023)).[7] The Court thus agrees with Defendants that, on this record, the "parties

---

[6] The Court notes that the analysis might have been different had Plaintiffs argued that North American LP had been dissolved. In that case, the LPA specifies certain provisions that survive dissolution and does not include Section 14.9. (*See* LPA § 14.21).

[7] At the very least, jurisdictional discovery would be required to determine when — and indeed if — Mr. Doorly and Mr. Neil ceased being partners in North American LP. Right now, Plaintiffs offer only two pieces of evidence in support of Mr. Doorly's and Mr. Neil's current status with respect to North American LP: (i) a submission by Mr. Doorly in the Delaware Action and (ii) a provision in Mr. Neil's Incentive Agreement that discusses the procedures for separation. (Pl. Opp. 11-12 (first citing Doorly Del. Reply 24-25; then citing Neil Incentive Agreement § 3)).

This evidence is insufficient. With particular respect to Mr. Doorly's Delaware submission, "[t]he Court may take judicial notice of a document filed before another court," but it may only consider the document "for the fact that [it] exist[s], ... not for the truth of the matters asserted therein." *Ferranti* v. *Arshack, Hajek & Lehrman PLLC*, No. 20 Civ. 2476 (KPF), 2021 WL 1143290, at *3 (S.D.N.Y. Mar. 21, 2021) (citing *Roth* v. *Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)). And Mr. Neil's Incentive Agreement is insufficient as well because it only discusses *how* Mr. Neil could separate from the partnership and is silent as to *whether* he ever did. (Def. Reply 3).

involved in the suit are subject to [Section 14.9(a)]." *Martinez*, 740 F.3d at 217 (internal quotation marks omitted) (quoting *Phillips*, 494 F.3d at 383); *see also Holick*, 802 F.3d at 394 (relaying a similar standard in the arbitration context).

**b. Section 14.9(a) Does Not Apply to the Claims Against the Individual Defendants**

*Second*, Plaintiffs argue that even if Section 14.9(a) were to apply to the parties, it does not cover the types of claims at issue here. The Court agrees. Section 14.9 governs disputes about the partnership itself and does not extend to disputes flowing from an employer-employee relationship, even if both employer and employee happen to be bound by the LPA.

Ironically, it is Mr. Doorly and his Delaware counsel (the same counsel that represents Defendants here) who made this identical argument in the Delaware Action. (Doorly Del. Reply 23 ("[Section 14.9(a)] is intended to encompass disputes concerning the internal affairs and business of the partnership itself, not independent tort claims alleged against an employee.")).[8] The Delaware court agreed with Mr. Doorly when it held that Section 14.9(a) did not give the court jurisdiction over North American LP's tortious interference claim because the tortious interference claim did not arise out of the LPA, *N. Am. LP I*, 2025 WL 736624, at *6, a holding that was not appealed, *see N. Am. LP II*, 2026 WL 274647, at *2 (noting that North American LP

8 Of course, Mr. Doorly is not the only relevant actor who has seemingly made an about-face on this topic. In the Delaware Action, Cross Fire and Altus's previous owner, North American LP, made the opposite argument that Cross Fire and Altus make here by arguing that Section 14.9(a) gave the Delaware court jurisdiction over the tort claim that North American LP brought against Mr. Doorly. (Doorly Del. Reply 23).

appealed only the lower court's dismissal of North American LP's contract claims, not its tort claims).

This Court agrees with the Delaware court that Section 14(a) does not extend to the claims arising between the parties. To reach this conclusion, the Court begins with the text of the LPA. *See United States* v. *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am.*, 970 F.2d 1132, 1136 (2d Cir. 1992) ("The interpretation of a written agreement begins with an examination of its language."). Section 14.9(a) mandates the arbitration of three categories of cases: (i) cases "(whether sounding in contract, tort or statute) concerning the construction, validity or interpretation of" the LPA or the Incentive Agreements; (ii) cases "based upon, aris[ing] out of or relat[ing] to" the LPA or the Incentive Agreements "or any breach or threatened breach hereof"; and (iii) derivative suits. (LPA § 14.9(a)).[9] The common thread is that the actions must closely relate to the partnership and the LPA.

---

[9] When discussing derivative suits, the LPA is particularly inartful. It compels arbitration for

> any Action (whether sounding in contract, tort or statute) (i) that is derivative in nature, (ii) brought on behalf of the Partnership or any of its Subsidiaries, (iii) asserting a claim of breach of any duty (including any fiduciary duty) owed, or alleged to be owed, by any … Person bound by or subject to this Agreement or any other Transaction Document, (iv) asserting a claim for a bad faith violation of the implied contractual covenant of good faith and fair dealing or (v) asserting a claim relating to the organization or internal affairs of the Partnership or any of its Subsidiaries[.]

(LPA § 14.9(a)). Contrary to Defendants' suggestion (*see* Def. Reply 2), and for a myriad of reasons, the Court interprets this provision to compel arbitration for actions that satisfy (i) and (ii), *as well as* one of (iii), (iv), or (v). In other words, suits that must be arbitrated under this third category of cases are derivative suits asserting (iii), (iv), or (v), not derivative suits *or* suits asserting (iii), (iv), or (v).

Reading the provision the other way — to only require (i), (ii), (iii), (iv), *or* (v) — would be nonsensical, arguably mandating arbitration in a dispute between two partners who got

This action is not a derivative suit, so it plainly does not fall under the third category. It comes closer to the first category but ultimately does not qualify. Plaintiffs do not ask the Court to rule on the construction, validity, or meaning of the LPA or Incentive Agreements. It is true that Plaintiffs ask the Court to examine the LPA and the Incentive Agreements, but only to understand the attempts by Altus's prior owners to protect confidential information and trade secrets. (Comp. ¶¶ 58-78). Plaintiffs' claims thus do not hinge on the meaning or enforceability of either the LPA or the Incentive Agreements.

The second category appears broader than the first or third, but Plaintiffs' claims still do not qualify. To be sure, Defendants are correct that the Complaint in this case alleges certain acts that may amount to violations of the LPA and the Incentive Agreements. (*See* Compl. ¶¶ 69, 78, 191, 198, 248; Def. Br. 8). But just because certain of Plaintiffs' allegations invoke certain documents does not mean that Plaintiffs' action is "based upon, arise[s] out of or relate[s] to" those documents. (LPA § 14.9(a)).

Here, Plaintiffs assert statutory and common law tort claims against the Individual Defendants that arise from Defendants' obligations as Plaintiffs' former employees and current competitors. As discussed, the LPA and the

into a car accident completely separate from their engagement with the partnership. *See Lee* v. *Marvel Enters., Inc.*, 386 F. Supp. 2d 235, 244 (S.D.N.Y. 2005) ("A contractual provision 'may not be interpreted in a manner which would render it an absurdity.'" (quoting *Saffire Corp.* v. *Newkidco., LLC*, 286 F. Supp. 2d 302, 308 (S.D.N.Y. 2003))). The structure of the sentence, in which (i) and (ii) specify the *manner* of the suit and (iii), (iv), and (v) specify the *topic* of the suit, compels such a reading as well.

Incentive Agreements discuss confidential information and trade secrets. (Compl. ¶¶ 14-15, 74-75; LPA § 3.13). But Plaintiffs rely on those documents only as examples of attempts by Altus's prior owners to protect such confidential information and trade secrets. (Comp. ¶¶ 58-78). Plaintiffs' claims could exist even if the LPA and the Incentive Agreements did not exist. Thus, this action cannot be said to "arise out of" or be "based upon" the LPA or the Incentive Agreements.

The argument that this action "relate[s] to" the LPA or the Incentive Agreements is more compelling. (LPA § 14.9(a)). But the Court declines to read this provision to mean that any dispute about any topic mentioned anywhere in the LPA or the Incentive Agreements must be arbitrated. Such a reading would render superfluous all other categories of cases listed in Section 14.9(a), and it would allow a single phrase — "relate to" — to run roughshod over a carefully crafted venue provision. *See Caring Habits, Inc.* v. *Fund for the Pub. Int., Inc.*, No. 11 Civ. 568 (NSR) (LMS), 2014 WL 7146041, at *5 (S.D.N.Y. Dec. 13, 2014) ("A court should read an integrated contract 'as a whole to ensure that undue emphasis is not placed upon particular words and phrases,' and 'to safeguard against adopting an interpretation that would render any individual provision superfluous.'" (citation omitted) (first quoting *Bailey* v. *Fish & Neave*, 8 N.Y.3d 523, 528 (2007); then quoting *Int'l Multifoods Corp.* v. *Com. Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002))); *accord, e.g.*, *Henderson* v. *Golden Corral Franchising Sys., Inc.*, 663 F. Supp. 3d 313, 329-30 (S.D.N.Y.

2023); *Chacko* v. *Costco Wholesale Corp.*, 568 F. Supp. 3d 487, 495-96 (S.D.N.Y. 2021).

Instead, the Court adopts a more internally consistent reading in which the "relate to" language in Section 14.9(a) of the LPA requires more than overlap in topics. (*See* LPA § 14.9(a)). Instead, to trigger Section 14.9(a), the LPA must be integral to — not just share a topic with — the underlying suit. This reading makes sense given that the second part of the "relate to" clause explicitly discusses "breach[es] or threatened breach[es]" of the LPA, suggesting that the "relate to" language has a limited reach. (*Id.*).[10] This reading makes even more sense given that the rest of Section 14.9(a) limits itself in meaningful ways to disputes internal to the partnership, such as derivative suits. *Two Farms Inc.* v. *Greenwich Ins. Co.*, 628 F. App'x 802, 804 (2d Cir. 2015) (summary order) ("In discerning intent, courts 'read the contract as a whole.'" (alteration adopted) (quoting *Iroquois Master Fund, Ltd.* v. *Quantum Fuel Sys. Techs. Worldwide, Inc.*, No. 13 Civ. 3860 (CM), 2013 WL 4931649, at *4 (S.D.N.Y. Sept. 12, 2013))).

There is no indication that the partnership intended the LPA as a whole — much less Section 14.9(a) — to broadly govern employment

---

10 Defendants seek comfort in the fact that Section 14.9(a) of the LPA expressly mentions claims "sounding in contract, tort, or statute." (LPA § 14.9; *see* Def. Reply 2). But that language is not as helpful as Defendants think. It appears only when discussing the first and third categories of cases. (LPA § 14.9). The Court has already explained why those categories do not, by their terms, apply here. And the absence of the "contract, tort, or statute" language in the second enumerated category actually supports this Court's view that the second category requires some alleged violation of the LPA, not a statute or tort principle.

relationships like those between Plaintiffs and the Individual Defendants. In fact, the LPA purports to have no effect "*in any way*" on any "employment agreement" between partners and subsidiaries of the partnership. (LPA § 5.7(d) (emphasis added)).[11] In sum, because Section 14.9(a) of the LPA applies only to claims internal to the partnership or directly based on the terms of the LPA, it does not govern Plaintiffs' claims, and those claims are properly before this Court.[12]

**B. The Court Declines to Abstain Under *Colorado River***

**1. Applicable Law**

Alternatively, Defendants ask that the Court abstain or stay this matter in favor of the Delaware Action. In this regard, "federal courts have a 'virtually

[11] Plaintiffs invoke Section 5.7(d) of the LPA in an additional way that the Court finds less persuasive. Specifically, Plaintiffs argue that the Court should read Section 5.7(d) of the LPA — which provides that "[n]othing in [the LPA] shall in any way affect … any … employee's … obligations (including duties) under any confidentiality agreement, noncompete agreement, nonsolicit agreement or any similar agreement with the Partnership or any of its Subsidiaries" (LPA § 5.7(d)) — to mean that Section 11(g) of the Individual Defendants' Incentive Agreements — which contains a narrower venue provision than Section 14.9(a) of the LPA (*see* Doorly Incentive Agreement § 11(g); Neil Incentive Agreement § 11(g)) — preempts Section 14.9(a) (*see* Pl. Opp. 12).

As discussed, the Court finds Section 5.7(d) of the LPA useful to interpret the meaning of Section 14.9(a). But it does not agree that a venue provision like Section 14.9(a) would "affect" the Individual Defendants' "obligations (including duties) under the" Incentive Agreement, which is required under Section 5.7(d) for the Court to find that Section 14.9(a) does not apply. (LPA § 5.7(d))

[12] Given the Court's holding that Section 14.9(a) does not apply to Plaintiffs' claims, it need not wade into the murky waters of whether Defendants, or at least Mr. Doorly, are judicially or collaterally estopped from arguing that Section 14.9(a) applies. (*Compare* Pl. Opp. 13-14 (arguing that the Individual Defendants are judicially estopped, and suggesting that Mr. Doorly is collaterally estopped, from making the arguments in their brief), *with* Def. Reply 3 (contesting Plaintiffs' arguments)).

The Court notes, however, that it would hold, at the very least, that Mr. Doorly is estopped from arguing that Section 14.9(a) applies to Plaintiffs' tortious interference claims, as he successfully argued exactly the opposite in Delaware. *See N. Am. LP I*, 2025 WL 736624, at *6.

unflagging obligation' to exercise their jurisdiction." *Niagara Mohawk Power Corp.* v. *Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 100 (2d Cir. 2012) (quoting *Colo. River Water Conservation Dist.* v. *United States*, 424 U.S. 800, 817 (1976)). But that "duty is not … absolute." *Quackenbush* v. *Allstate Ins. Co.*, 517 U.S. 706, 716 (1996). A federal court may decline to exercise its jurisdiction in "'exceptional circumstances,' where denying a federal forum would clearly serve an important countervailing interest." *Id.* (quoting *Colo. River Water Conservation Dist.*, 424 U.S. at 813).

"In the seminal case of *Colorado River Water Conservation District* v. *United States*, the Supreme Court set forth what is now referred to as the *Colorado River* abstention doctrine." *Thompson* v. *Daxor Corp.*, No. 23 Civ. 8272 (KPF), 2024 WL 1484192, at *2 (S.D.N.Y. Apr. 5, 2024). Under that doctrine, a federal court may abstain from exercising jurisdiction "in situations involving the contemporaneous exercise of concurrent jurisdictions [by a federal and state court]." *Colo. River Water Conservation Dist.*, 424 U.S. at 817.

But the existence of a contemporaneous state court action alone is not sufficient for abstention. "In deciding whether to abstain under *Colorado River*, a district court must first determine whether the federal and state court cases are parallel." *U.S. Bank Nat'l Ass'n* v. *E. Fordham DE LLC*, 804 F. App'x 106, 107 (2d Cir. 2020) (summary order) (citing *Nat'l Union Fire Ins. Co.* v. *Karp*, 108 F.3d 17, 22 (2d Cir. 1997)). "Federal and state proceedings are parallel for purposes of abstention when the two proceedings are 'essentially the same' —

when there is an identity of parties, and the issues and relief sought are the same." *Id.* (quoting *Nat'l Union Fire Ins. Co.*, 108 F.3d at 22).

That said, "'[p]erfect symmetry of parties and issues is not required' for the federal and state proceedings to be considered parallel." *Phillips* v. *Citibank, N.A.*, 252 F. Supp. 3d 289, 295 (S.D.N.Y. 2017) (quoting *Abe* v. *N.Y. Univ.*, No. 14 Civ. 9323 (RJS), 2016 WL 1275661, at *6 (S.D.N.Y. Mar. 30, 2016)). Regarding parallelism of parties, what matters more is that "the interests of the parties in each case are congruent," *Pappas Harris Cap., LLC* v. *Bregal Partners, L.P.*, No. 20 Civ. 6911 (VEC), 2021 WL 3173429, at *5 (S.D.N.Y. July 27, 2021) (internal quotation marks omitted) (quoting *Greenburgh No. 11 Fed'n of Tchrs.* v. *Bd. of Educ. of Greenburgh Eleven Union Free Sch. Dist.*, No. 95 Civ. 2938 (JSR), 2006 WL 4490731, at *2 (S.D.N.Y. Sept. 26, 2006)), such that "they would benefit from the same outcome," *id.* (collecting cases).

And regarding parallelism of issues, "even if different relief is sought in the two actions, or the claims are not exactly the same, they are parallel as long as the causes of action are comprised of the same essential issues." *Tuebor Reit Sub LLC* v. *Paul*, No. 19 Civ. 8540 (JPO), 2020 WL 4897137, at *5 (S.D.N.Y. Aug. 19, 2020) (internal quotation marks omitted) (quoting *Garcia* v. *Tamir*, No. 99 Civ. 298 (LAP), 1999 WL 587902, at *3 (S.D.N.Y. Aug. 4, 1999)). Put another way, "parallelism is achieved where there is a substantial likelihood that the state litigation will dispose of all claims presented in the

federal case." *Abe*, 2016 WL 1275661, at *6 (internal quotation marks omitted) (quoting *Shields* v. *Murdoch*, 891 F. Supp. 2d 567, 577 (S.D.N.Y. 2012)).

If the actions are parallel, the court must then consider six factors laid out in *Colorado River* to determine whether to abstain from exercising jurisdiction. *U.S. Bank Nat'l Ass'n*, 804 F. App'x at 107. The factors are:

> [i] the assumption of jurisdiction by either court over any res or property; [ii] the inconvenience of the federal forum; [iii] the avoidance of piecemeal litigation; [iv] the order in which jurisdiction was obtained; [v] whether state or federal law supplies the rule of decision; and [vi] whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction.

*Id.*; *accord Colo. River Water Conservation Dist.*, 424 U.S. at 818-19; *Niagara Mohawk Power Corp.*, 673 F.3d at 100-01; *Kamerman* v. *Steinberg*, 681 F. Supp. 206, 213 (S.D.N.Y. 1988). Courts in this Circuit also sometimes consider a seventh factor, namely, whether either the state or federal litigation is "vexatious or reactive." *See, e.g.*, *De Oliveira* v. *Tenet Healthcare*, No. 25 Civ. 1683 (VSB) (GS), 2025 WL 3241217, at *10 (S.D.N.Y. Nov. 20, 2025) (internal quotation marks omitted) (quoting *Telesco* v. *Telesco Fuel & Masons' Materials, Inc.*, 765 F.2d 356, 363 (2d Cir. 1985)).

### 2. The Instant Action and the Delaware Action Are Not Parallel

Abstention under *Colorado River* is not appropriate here because neither the parties nor the issues in the instant action are parallel to those in the Delaware Action. The Court will discuss the parties and the issues in turn.

**a. Parallelism of Parties Is Lacking**

The parties in this action are not substantially similar to those in the Delaware Action, which alone dooms Defendants' *Colorado River* argument. The only common party between the two actions is Mr. Doorly. North American LP, then-owner of Altus and Cross Fire, brought the Delaware Action against Mr. Doorly. Now, Altus and Cross Fire bring this action against Mr. Doorly, Mr. Neil, and their new company, Empire Fire.

Of course, perfect symmetry is not required. *See, e.g.*, *Phillips*, 252 F. Supp. 3d at 295. But here, the parties also have different interests. *Pappas Harris Cap., LLC*, 2021 WL 3173429, at *5. The only remaining claim in Delaware is that Mr. Doorly breached his Incentive Agreement. *N. Am. LP II*, 2026 WL 274647, at *1 ("North American Fire [LP] filed the action against its former employee for violating restrictive covenants under an Incentive Unit Grant Agreement."). Empire Fire was not bound by the Incentive Agreement, and Plaintiffs' claims against Mr. Neil here do not hinge on whether Mr. Doorly breached his Incentive Agreement. Accordingly, as a matter of law, Mr. Neil and Empire Fire have little at stake in the Delaware Action. *Cf. CAF Bridge Borrower GS, LLC* v. *Grunfeld*, No. 25 Civ. 1114 (KPF), 2026 WL 1640966, at *5 (S.D.N.Y. June 8, 2026) (finding parallelism despite a lack of identity of parties when the liability of the defendant in the federal action hinged on the liability of a third party in the state action). Mr. Neil and Empire Fire would not "benefit from the same outcome" in the Delaware Action as Mr. Doorly, so parallelism of parties is lacking. *Pappas Harris Cap., LLC*, 2021 WL 3173429, at *5.

**b. Parallelism of Issues Is Lacking**

*Colorado River* abstention is improper for at least one additional independent reason: The issues in the instant action are different than those in the Delaware Action. Defendants argue that parallelism of issues is present because "at least six of Plaintiffs' nine causes of action arise from the same nucleus of fact as the claims asserted in the Delaware Action." (Def. Br. 19). That may be true. But for two reasons, it is insufficient to find parallelism of issues.

*First*, while there is factual overlap, the legal issues between the two actions are distinct. There is no shared legal issue among the statutory and common-law tort claims asserted here and the contract claim in the Delaware Action. And "[w]hen 'the nature of the claims' in question differs, cases are not parallel despite 'the fact that both actions arise out of a similar set of circumstances.'" *DDR Constr. Servs.* v. *Siemens Indus., Inc.*, 770 F. Supp. 2d 627, 645 (S.D.N.Y. 2011) (quoting *Farkas* v. *D'Oca*, 857 F. Supp. 300, 303 (S.D.N.Y. 1994)). Because the Delaware Action features only a contract claim against Mr. Doorly, the Delaware court will not resolve any issues regarding the conduct of Mr. Neil or Empire Fire, or any issues related to Plaintiffs' tort claims.

In other words, any ruling in Delaware would not affect the relief sought here, so there is no parallelism of issues. Indeed, even Plaintiffs' current claims against Mr. Doorly himself do not require a finding that he breached his Incentive Agreement, the issue at play in the Delaware Action. Far from "a

substantial likelihood," there is *no way* that the state litigation could "dispose of all the claims presented in the federal case." *Abe*, 2016 WL 1275661, at *6 (internal quotation marks omitted) (quoting *Shields*, 891 F. Supp. 2d at 577). Because Defendants may be liable in the instant action notwithstanding whether Mr. Doorly breached the Incentive Agreement, issue parallelism is lacking, and *Colorado River* abstention is improper.

*Second*, Defendants acknowledge that three of Plaintiffs' claims are completely new when compared with the Delaware Action. (Def. Br. 19). Those three counts alone are enough to counsel against abstention, given that their presence means that the state case cannot resolve Plaintiffs' case here. *See Abe*, 2016 WL 1275661, at *6. In sum, because the instant action and the Delaware Action are not parallel, abstention is not appropriate, and the Court need not consider the *Colorado River* factors. *See Gokhvat Holdings LLC* v. *U.S. Bank Nat'l Ass'n*, No. 21 Civ. 2558 (LGS), 2022 WL 3668270 (S.D.N.Y. Aug. 25, 2022) ("Because there are no parallel proceedings, there is no need to analyze the six-factor *Colorado River* balancing test." (citing *Mochary* v. *Bergstein*, 42 F.4th 80, 86 (2d Cir. 2022))).

### C. The Court Declines to Issue a Discretionary Stay

#### 1. Applicable Law

"[E]ven where a Court may not abstain under *Colorado River*, it may, 'in the exercise of its discretion,' 'stay proceedings in the action before it pending a decision by the state court, with a view to avoiding wasteful duplication of judicial resources and having the benefit of the state court's views.'" *Chartis*

*Seguros Mex., S.A. de C.V.* v. *HLI Rail & Rigging, LLC*, No. 11 Civ. 3238 (JSR), 2011 WL 13261585, at *2 (S.D.N.Y. Nov. 3, 2011) (alteration adopted) (quoting *Giulini* v. *Blessing*, 654 F.2d 189, 193 (2d Cir. 1981)); *accord Wells Fargo Bank, Nat'l Ass'n* v. *Patel*, No. 24 Civ. 1162 (KPF), 2025 WL 844161, at *9 (S.D.N.Y. Mar. 18, 2025). "The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Louis Vuitton Malletier S.A.* v. *LY USA, Inc.*, 676 F.3d 83, 97 (2d Cir. 2012) (internal quotation marks omitted and alteration adopted) (quoting *Landis* v. *N. Am. Co.*, 299 U.S. 248, 254 (1936)).

The party seeking the stay has the burden to establish its need. *See Clinton* v. *Jones*, 520 U.S. 681, 708 (1997). In deciding whether to stay a case where there is a pending state court action, courts consider the following factors:

> [i] considerations of comity;
>
> [ii] promotion of judicial efficiency;
>
> [iii] adequacy and extent of relief available in the alternative forum;
>
> [iv] identity of parties and issues in both actions;
>
> [v] likelihood of prompt disposition in the alternative forum;
>
> [vi] convenience of the parties, counsel and witnesses; and
>
> [vii] possibility of prejudice to a party as the result of the stay.

*Chartis*, 2011 WL 13261585, at *2 (quoting *De Carvalhosa* v. *Lindgren*, 546 F. Supp. 228, 230 (S.D.N.Y. 1982)); *cf. Readick* v. *Avis Budget Grp., Inc.*, No. 12 Civ. 3988 (PGG), 2014 WL 1683799, at *2 (S.D.N.Y. Apr. 28, 2014) (presenting analogous stay factors and citing *Kappel* v. *Comfort*, 914 F. Supp. 1056, 1058 (S.D.N.Y. 1996)).

**2. Analysis**

Here, for reasons similar to those stated in its *Colorado River* analysis, the Court declines to stay the instant action. Certain facts are particularly relevant: *First*, all parties and counsel to this action work in New York, and potential witnesses and relevant documents appear to also be in New York. (Compl. ¶¶ 12-16). Delaware is thus a less convenient forum. *Second*, as discussed above, the parties and issues in the instant action are distinct from those in the Delaware Action, meaning that the relief available in Delaware is wholly inadequate to resolve the instant case. *Third*, Plaintiffs' claims in this action arise under either federal law or New York law, and none applies Delaware law.

*Fourth*, the instant action is further along than the Delaware Action. *See N. Am. LP II*, 2026 WL 274647, at *4 (remanding the Delaware Action to the Court of Chancery for further proceedings). The Delaware Action also has a pending motion to stay, filed considerably after this one, and it appears as though discovery may be put off even if that motion is denied, if Mr. Doorly renews his claim that the restrictive covenants in his Incentive Agreement are overbroad. *See N. Am. LP I*, 2025 WL 736624, at *3 ("Because Defendant's first

argument that the Agreement lacks consideration is sufficient, the court does not analyze whether the covenants are overbroad."). Conversely, discovery is ongoing in the instant action. (*See* Dkt. #26, 57, 62).

In sum, a stay here would not serve the twin aims of a discretionary stay: "avoiding wasteful duplication of judicial resources and having the benefit of the state court's views." *Chartis Seguros*, 2011 WL 13261585, at *2 (internal quotation marks omitted) (quoting *Giulini*, 654 F.2d at 193). At most, the Delaware Action could resolve some questions of fact regarding Mr. Doorly's conduct, but that still leaves much for this Court to decide. There is no reason for the Delaware Action to delay any progress in this action. Instead, the Court turns to the sufficiency of Plaintiffs' allegations.

### D. The Court Grants in Part and Denies in Part Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6)

#### 1. Applicable Law

Under Rule 12(b)(6), a defendant may seek dismissal of a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), a court must "draw all reasonable inferences in [the plaintiff's] favor, 'assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief.'" *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). "In considering a motion to dismiss for failure to state a claim pursuant to Rule

12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (quoting *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)).

A plaintiff can overcome a Rule 12(b)(6) motion if the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [Plaintiff's] claims across the line from conceivable to plausible.'" (quoting *Twombly*, 550 U.S. at 570)). Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

### 2. Plaintiffs Adequately Plead a Claim Under the Defend Trade Secrets Act

"The DTSA provides a private right of action for 'an owner of a trade secret that is misappropriated if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.'" *Zabit* v. *Brandometry, LLC*, 540 F. Supp. 3d 412, 419 (S.D.N.Y. 2021) (alterations adopted) (quoting 18 U.S.C. § 1836(b)(1)). To adequately plead a claim under the DTSA, a plaintiff must plausibly allege that "[i] it possessed a trade secret,

and [ii] the defendant misappropriated the trade secret." *Better Holdco, Inc.* v. *Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 384 (S.D.N.Y. 2023) (internal quotation marks omitted) (quoting *Democratic Nat'l Comm.* v. *Russian Federation*, 392 F. Supp. 3d 410, 447 (S.D.N.Y. 2019)).

A baseline requirement is that the information misappropriated is, in fact, a trade secret. Such is the case when (i) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information" and (ii) "the owner ... has taken reasonable measures to keep such information secret." 18 U.S.C. § 1839(3); *accord Mason* v. *AmTrust Fin. Servs., Inc.*, No. 19 Civ. 8364 (DLC), 2020 WL 1330688, at *3 (S.D.N.Y. Mar. 23, 2020).[13]

Information that is a trade secret does not automatically maintain that status in perpetuity. Distributing purported trade secrets to individuals who are not bound to protect them waives whatever trade secret protection that information might have previously enjoyed. *See Pauwels* v. *Deloitte LLP*, 83

[13] Plaintiffs appear to suggest that whether the owner of information took steps to keep it secret is not strictly necessary to qualify that information as a trade secret under the DTSA. (Pl. Opp. 14). But Plaintiffs confuse the requirements of federal and state law. The DTSA explicitly defines a trade secret as information "the owner thereof has taken reasonable measures to keep ... secret." 18 U.S.C. § 1839(3)(A). New York law, on the other hand, instructs courts to consider secrecy efforts as one factor among six — none of which is required — to plead a trade secret. *See Integrated Cash Mgmt. Servs., Inc.* v. *Digit. Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990) (applying the six-factor test under New York law and citing New York state case law in support); *N. Atl. Instruments, Inc.* v. *Haber*, 188 F.3d 38, 44 (2d Cir. 1999) (same). Because Plaintiffs raise a claim under the DTSA, not New York state law, a required element is that Plaintiffs made efforts to keep the information secret. *See* 18 U.S.C. § 1839(3)(A).

F.4th 171, 182-83 (2d Cir. 2023) (affirming dismissal of a trade secret claim because the plaintiff "disclosed the [trade secrets] to individuals … who were not obligated to keep his materials secret").

Defendants claim that Plaintiffs' DTSA claim fails because Plaintiffs (i) have failed to allege reasonable efforts to preserve the secrecy of their supposed trade secrets (Def. Br. 10-11), and (ii) have failed to allege an interstate nexus (*id.* at 11-12). The Court disagrees on both fronts, so Plaintiffs' DTSA claim may move forward.

**a. Plaintiffs Adequately Plead Reasonable Efforts to Preserve the Secrecy of Their Trade Secrets**

Plaintiffs here allege various steps that Cross Fire took to guard the secrecy of certain information in the years before the Individual Defendants' departure. Specifically, Cross Fire required the Individual Defendants — and indeed many if not all Cross Fire employees — to sign multiple confidentiality agreements prior to 2023. (Compl. ¶¶ 27, 58-80). This is sufficient to allege that Cross Fire made efforts to keep its confidential information secret.

Defendants latch onto the fact that the Complaint is unclear about any efforts that Cross Fire took to keep its information secret between its founding in 1993 and its sale in May 2021. (Def. Br. 10-11). This point is well taken, and it may ultimately limit Defendants' liability at a later stage in the litigation. That is because it is unclear whether information that Cross Fire generated before 2021 can qualify as a trade secret.

But Defendants ignore the fact that Plaintiffs allege trade secrets in information produced after 2021, which is enough to support their claim. (*See,*

*e.g.*, Compl. ¶ 98 (alleging theft of a strategic plan developed in May 2021, though it is unclear whether this came from before or after Cross Fire's sale that same month); *id.* ¶ 66 (alleging that Cross Fire's data that was eventually stolen was consistently kept "up-to-date")). Indeed, modifying previously public information can in some instances turn that information into a trade secret. *See Anacomp, Inc.* v. *Shell Knob Servs., Inc.*, No. 93 Civ. 4003 (PKL), 1994 WL 9681, at *10 n.9 (S.D.N.Y. Jan. 10, 1994) (explaining that certain unprotected material may "have been modified to such an extent that they have become ... protected trade secrets" (citing *Metallurgical Indus. Inc.* v. *Fourtek, Inc.*, 790 F.2d 1195, 1199-1201 (5th Cir. 1986))). At the very least, Plaintiffs sufficiently plead that they made reasonable efforts to protect certain trade secrets generated or compiled in or after May 2021.

**b. Plaintiffs Adequately Plead an Interstate Nexus**

The Court next turns to Defendants' argument that Plaintiffs have failed to allege an interstate nexus. (Def. Br. 11-12). The DTSA applies only to trade secrets "related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Here, the Complaint alleges that "Cross Fire's trade secrets relate to its business of designing, installing, and servicing life safety systems ... throughout the New York area." (Compl. ¶ 184). It further asserts that Cross Fire does business in New York, New Jersey, and Connecticut and held licenses to perform its business in New York and New Jersey. (*Id.* ¶¶ 12, 38). The Complaint also alleges that Empire Fire's business is in New York, New Jersey, and Connecticut. (*Id.* ¶¶ 16, 45).

The interstate nature of Cross Fire's business is sufficient for purposes of pleading a DTSA claim. *See, e.g.*, *Yager* v. *Vignieri*, No. 16 Civ. 9367 (DLC), 2017 WL 4574487, at *2 (S.D.N.Y. Oct. 12, 2017) (holding that a doctor alleged an interstate nexus because some of his patients "travel[ed] from New Jersey into New York to use his services"); *Intertek Testing Servs., N.A., Inc.* v. *Pennisi*, 443 F. Supp. 3d 303, 327 (E.D.N.Y. 2020) (holding that the plaintiff pleaded an interstate nexus because its services were used "by customers in the New York metropolitan area, including the State of New Jersey"); *cf. United States* v. *Agrawal*, 726 F.3d 235, 244 n.7 (2d Cir. 2013) (explaining that Congress crafted the commerce language in the DTSA to "reach broadly in protecting against the theft of trade secrets").

Defendants protest that these allegations are too "generic" to establish an interstate nexus. (Def. Br. 11-12; Def. Reply 4-5). And they focus on the fact that Plaintiffs' main allegations of trade secret misappropriation occurred in New York. (Def. Br. 11-12 (citing Compl. ¶¶ 83, 114, 119, 145, 147-150, 157)). But Defendants offer no case from this Circuit in which a court has held that allegations of doing business in multiple states were insufficient to establish an interstate nexus. (*See* Def. Reply 4-5 (citing only one case from the Western District of Pennsylvania)).

More fundamentally, Defendants overlook that the DTSA does not require the misappropriation to occur in multiple states; it only requires the trade secret to "relate[ ] to a product or service used in, or intended for use in, interstate … commerce." 18 U.S.C. § 1836(b)(1). In other words, the question

is not where Defendants allegedly used Plaintiffs' trade secrets. It is whether Defendants' or Plaintiffs' service is intended for use in interstate commerce. Plaintiffs have certainly alleged the latter. Consequently, the Court holds that Plaintiffs have adequately pleaded a DTSA claim.

### 3. Plaintiffs Adequately Plead a Claim for False Advertising Under New York General Business Law § 350

Next, Defendants challenge Plaintiffs' claim for false advertising under General Business Law § 350. (Def. Br. 12-14). To plead a claim under Section 350, "a plaintiff must allege (i) that the defendant engaged in consumer-oriented conduct; (ii) that the conduct was materially misleading; and (iii) that the plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Cosgrove* v. *Or. Chai, Inc.*, 520 F. Supp. 3d 562, 575 (S.D.N.Y. 2021) (internal quotation marks omitted and alterations adopted) (quoting *Weisblum* v. *Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 292 (S.D.N.Y. 2015)); *accord MacNaughton* v. *Young Living Essential Oils, LC*, 67 F.4th 89, 98 n.10 (2d Cir. 2023). The statute provides "a 'right of action to any person who has been injured by reason of any violation of this section." *Securitron Magnalock Corp.* v. *Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) (quoting *H20 Swimwear, Ltd.* v. *Lomas*, 560 N.Y.S.2d 19, 21 (1st Dep't 1990)); *see* N.Y. Gen. Bus. Law § 349(h).

Despite this broad language, the Second Circuit has recognized that "the gravamen of the complaint must be consumer injury or harm to the public interest." *Securitron Magnalock Corp.*, 65 F.3d at 264 (internal quotation marks omitted) (quoting *Azby Brokerage, Inc.* v. *Allstate Ins. Co.*, 681 F. Supp. 1084, 1089 n.6 (S.D.N.Y. 1988)); *see also Kuklachev* v. *Gelfman*, 600 F. Supp.

2d 437, 476 (E.D.N.Y. 2009) ("A plaintiff must charge conduct of the defendant that has a broad impact on consumers at large, rather than conduct that pertains to private disputes between the parties."). With this in mind, "corporate competitors … have standing to bring a claim under [Section 350] so long as some harm to the public at large is at issue." *Securitron Magnalock Corp.*, 65 F.3d at 264 (internal quotation marks omitted) (quoting *Bristol-Myers Squibb Co.* v. *McNeil-P.P.C., Inc.*, 786 F. Supp. 182, 215 (E.D.N.Y.), *vacated in part on other grounds*, 973 F.2d 1033 (2d Cir. 1992)). Defendants argue that Plaintiffs' Section 350 claim suffers from two deficiencies, which the Court will address in turn.

#### a. Plaintiffs Adequately Plead Harm to the Public at Large

*First*, Defendants argue that Plaintiffs, who are corporate competitors rather than consumers, have not adequately alleged harm to the public at large, as required for corporate competitors to allege a Section 350 claim under *Securitron.* (Def. Br. 12-13). Instead, they posit that Plaintiffs' allegations recount only "one-off efforts to target Cross Fire." (*Id.* at 13). The Court disagrees.

According to Plaintiffs, Defendants created and disseminated fabricated press releases — stylized to appear to have come from a reputable industry publication — to "thousands of businesses" and "thousands of customers" "to mislead industry participants." (Compl. ¶¶ 165-171, 206, 215). This is sufficient under *Securitron.* In that case, the Second Circuit found three harms to the public resulting from the defendants' false advertising: (i) a regulatory

agency's decision to undertake an investigation, (ii) the possible "cancellation of an awarded contract," and (iii) the "diver[sion] [of] attention of" an industry actor that maintained a list of approved service providers. *Securitron Magnalock Corp.*, 65 F.3d at 264-65.

Defendants focus on the fact that Plaintiffs do not argue that the alleged false advertising caused unnecessary regulatory action. (Def. Reply 5). They are right. But they overlook the fact that the other two forms of harm from *Securitron* are present here. Specifically, Defendants' alleged false press releases may have caused certain customers to decline to do business with Cross Fire. (Compl. ¶ 209 (alleging that customers lost confidence in Cross Fire and brought their business elsewhere due to the false press releases)). *Cf. Securitron Magnalock Corp.*, 65 F.3d at 265. And because Defendants sent their fabricated press releases to customers, no doubt the press releases improperly "divert[ed] the attention" of certain consumers and industry actors. All of this harmed the public at large — not just Plaintiffs. *Id.*

**b. Plaintiffs Adequately Plead Injury**

*Second*, Defendants argue that Plaintiffs have insufficiently alleged that Defendants' conduct caused injury to Plaintiffs. (Def. Br. 13-14). This, too, is incorrect. To sustain a false advertising claim, "a plaintiff must prove 'actual' injury ... , though not necessarily pecuniary harm." *Stutman* v. *Chem. Bank*, 95 N.Y.2d 24, 29 (2000). The Complaint sufficiently alleges that Defendants fabricated press releases caused Plaintiffs to suffer injuries including the loss

of customer confidence, good will, ongoing business, and future business opportunities. (Compl. ¶¶ 209-210, 219).

Plaintiffs even point out a specific lost customer. (Compl. ¶ 162). The fact that it remains unclear whether Plaintiffs lost that customer because of Defendants' alleged misuse of trade secrets or Defendants' alleged false advertising is of no moment at this stage. Plaintiffs have adequately pleaded injury, and their claim under Section 350 may move forward.

#### 4. Plaintiffs Adequately Plead a Claim for Tortious Interference with Business Relations

Defendants next argue that Plaintiffs have failed to state a tortious interference claim. (Def. Br. 14-16). Under New York law

> [t]o prevail on a claim for tortious interference with business relations — also known as tortious interference with prospective economic advantage — … a plaintiff must show that "[i] the plaintiff had business relations with a third party; [ii] the defendant interfered with those business relations; [iii] the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and [iv] the defendant's acts injured the relationship."

*16 Casa Duse, LLC* v. *Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (citation omitted) (quoting *Catskill Dev., L.L.C.* v. *Park Place Ent. Corp.,* 547 F.3d 115, 132 (2d Cir. 2008)).

The third — or "wrongful means" — element is unique in a claim for tortious interference with business relations. "Unlike a claim for tortious interference with contract, … a claim for tortious interference with business relations requires a plaintiff to show, 'as a general rule,' that 'the defendant's conduct amounted to a crime or an independent tort.'" *16 Casa Duse, LLC*,

791 F.3d at 262 (alteration adopted) (quoting *Carvel Corp.* v. *Noonan*, 3 N.Y.3d 182, 190 (2004)).[14]

An exception to this "general rule" enables a plaintiff to establish the "wrongful means" element if "a defendant engages in conduct for the sole purpose of inflicting intentional harm on plaintiffs," even if that conduct is not an independent crime or tort. *16 Casa Duse, LLC*, 791 F.3d at 262 (internal quotation marks omitted) (quoting *Carvel Corp.*, 3 N.Y.3d at 190). But that "exception is narrow" and can be defeated if the "defendant has acted with a permissible purpose, such as 'normal economic self-interest.'" *Id.* (quoting *Carvel Corp.*, 3 N.Y.3d at 190). "The New York Court of Appeals has not yet identified any other exceptions to the general rule." *Id.*

Here, Defendants argue that Plaintiffs have insufficiently pleaded the "wrongful means" element. (Def. Br. 15-16). And even then, they acknowledge that Plaintiffs have alleged an underlying tort: that Defendants breached their fiduciary duties to Plaintiffs. (*Id.*). Still, Defendants argue that such allegations are insufficient because Plaintiffs must allege that Defendants directed their underlying wrongful or tortious conduct at customers rather than Plaintiffs. (*Id.*).

Defendants have a point. In *Carvel Corp.*, the New York Court of Appeals considered whether the plaintiffs had pleaded that the defendant had "use[d] wrongful 'economic pressure'" sufficient to establish the "wrongful means"

---

14 Plaintiffs acknowledge that they have only raised a claim for tortious interference with business relations, and not a claim for tortious interference with contract. (Pl. Opp. 17-19 & n.5).

element. 3 N.Y.3d at 192 (quoting *Guard-Life Corp.* v. *S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191 (1980)). The Court found the third element lacking because "the economic pressure that must be shown is not … pressure on the [plaintiffs], but on the [plaintiffs'] customers." *Id.* *Carvel Corp.* suggests that wrongful conduct directed only at Plaintiffs may not be enough for tortious interference with business relations — the wrongful conduct must be directed "at the party with which the plaintiff has or seeks to have a relationship" — Plaintiffs' customers. *Id.*

That said, Defendants' argument fails because they ignore the *other* torts, including the misappropriation of trade secrets and unfair competition, that Plaintiffs have alleged, and that are "directed[ ] at [Plaintiffs'] customers or other businesses." *Insight Glob., LLC* v. *Wenzel*, No. 17 Civ. 8323 (PGG), 2018 WL 11318728, at *3 (S.D.N.Y. Aug. 27, 2018). Indeed, "[n]umerous courts have recognized that allegations of … misappropriation of trade secrets and unfair competition … suffice to establish the 'wrongful means' element at the pleadings stage.'" *Id.* at *5 (collecting cases). This Court thus follows many of its sister courts in holding that Plaintiffs' trade secrets and unfair competition allegations are sufficient to support the "wrongful means" element of Plaintiffs' tortious interference claim. *See, e.g.*, *ExpertConnect, L.L.C.* v. *Fowler*, No. 18 Civ. 4828 (LGS), 2019 WL 3004161, at *9 (S.D.N.Y. July 10, 2019); *Insight Glob. LLC*, 2018 WL 11318728, at *5; *Advance Watch Co.* v. *Pennington*, No. 13 Civ. 8169 (JMF), 2014 WL 5364107, at *6 (S.D.N.Y. Oct. 22, 2014); *Faiveley Transp. USA, Inc.* v. *Wabtec Corp.*, 758 F. Supp. 2d 211, 222 (S.D.N.Y. 2010);

*All R's Consulting, Inc.* v. *Pilgrims Pride Corp.*, No. 06 Civ. 3601 (DAB), 2008 WL 852013, at *15-16 (S.D.N.Y. Mar. 28, 2008).[15]

**5. Plaintiffs Fail to Plead a Conversion Claim**

Defendants also challenge Plaintiffs' claim for conversion. (Def. Br. 16-17). Under New York law, "[t]o plausibly allege a conversion claim, a plaintiff must show: [i] the property subject to conversion is a specific identifiable thing; [ii] plaintiff had ownership, possession or control over the property before its conversion; and [iii] defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Generation Next Fashions Ltd.* v. *JP Morgan Chase Bank, NA*, 698 F. Supp. 3d 663, 679 (S.D.N.Y. 2023) (internal quotation marks omitted) (quoting *Benex LC* v. *First Data Merch. Servs. Corp.*, No. 14 Civ. 6393 (JS) (AKT), 2016 WL 1069657, at *5 (E.D.N.Y. Mar. 16, 2016)).

In New York, electronic records can be the proper subject of conversion claims. *Thyroff* v. *Nationwide Mut. Ins. Co.*, 8 N.Y.3d 283, 292-93 (2007). But even in such cases, exclusion is required to make out a claim for conversion. *Reis, Inc.* v. *Spring11 LLC*, No. 15 Civ. 2836 (PGG), 2016 WL 5390896, at *10 (S.D.N.Y. Sept. 26, 2016). Indeed, "[c]ases of 'pure copying' do not satisfy the required elements of conversion." *Turret Labs USA, Inc.* v. *CargoSprint, LLC*,

---

15 Indeed, Defendants appear to recognize that Plaintiffs' trade secrets and unfair competition claims qualify as wrongful conduct for purposes of Plaintiffs' tortious interference claim. (Def. Reply 6). Their only argument to the contrary is that the Court should dismiss Plaintiffs' trade secrets and unfair competition claims on other grounds. (*Id.*). Because the Court declined to dismiss those claims, *supra*, the Court also declines to dismiss Plaintiffs' tortious interference claim.

No. 19 Civ. 6793 (EK) (RML), 2021 WL 535217, at *6 (E.D.N.Y. Feb. 12, 2021) (quoting *Fischkoff* v. *Iovance Biotherapeutics, Inc.*, 339 F. Supp. 3d 408, 415 (S.D.N.Y. 2018)), *aff'd*, No. 21-952, 2022 WL 701161 (2d Cir. Mar. 9, 2022) (summary order).

Defendants argue that Plaintiffs' conversion claim fails on the exclusion element because the Complaint only alleges that Defendants "accessed and shared" certain of Plaintiffs' files. (Compl. ¶¶ 49-53, 275; *see* Def. Br. 16-17). Here, Defendants are right. Defendants' alleged conduct did not deprive Plaintiffs of access to or use of their files, which is required for conversion. *See, e.g.*, *Fischkoff*, 339 F. Supp. 3d at 414 ("[C]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another *to the exclusion* of the owner's rights." (internal quotation marks omitted and emphasis added) (quoting *Vigilant Ins. Co. of Am.* v. *Hous. Auth.*, 87 N.Y.2d 36, 44 (1995))); *Reis, Inc.*, 2016 WL 5390896, at *10.

Plaintiffs counter that Defendants' access to Plaintiffs' information "destroyed" Plaintiffs' "competitive advantage." (Pl. Opp. 19). Plaintiffs point to two trial court cases — one federal case from outside this District and one state case — supporting their assertion that conversion only requires the diminution in value of a plaintiff's property. (*Id.* at 19-20 (first citing *Clark St. Wine & Spirits* v. *Emporos Sys. Corp.*, 754 F. Supp. 2d 474, 484 (E.D.N.Y. 2010); then citing *N.Y. Racing Ass'n* v. *Nassau Reg'l Off-Track Betting Corp.*, 909 N.Y.S.2d 866, 871 (Sup. Ct. Nassau Cnty. 2010))).

But Plaintiffs fail to mention that subsequent decisions have almost uniformly rejected the approach of those two cases. *See, e.g.*, *Broker Genius, Inc.* v. *Seat Scouts LLC*, No. 17 Civ. 8627 (SHS), 2018 WL 2214708, at *6 (S.D.N.Y. May 14, 2018) (noting that "courts in this circuit … have uniformly rejected th[is] theory" and collecting cases); *Reis, Inc.*, 2016 WL 5390896, at *10-11 ("While New York courts have recognized that conversion can be predicated on the loss of intangible electronic data, that case law has not 'altered the traditional rule requiring the exercise of unauthorized dominion and control to the complete exclusion of the rightful possessor.'" (alteration adopted) (quoting *Geo Grp., Inc.* v. *Cmty. First Servs.*, No. 11 Civ. 1711 (CBA), 2012 WL 1077846, at *9 (E.D.N.Y. 2012))). Because Plaintiffs do not and cannon plead exclusion, their conversion claim is dismissed with prejudice. *See Cuoco* v. *Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (dismissing with prejudice because "[t]he problem with [the] causes of action is substantive; better pleading will not cure it").

## CONCLUSION

For the reasons set forth above, Defendants' motion is GRANTED IN PART and DENIED IN PART. This action will remain on the Court's active docket, and each of Plaintiffs' claims will move forward, with the exception of Plaintiffs' conversion claim. On or before **July 30, 2026**, the parties shall file a proposed third amended case management plan that provides for fact discovery on the remaining counts and expert discovery on all counts.

The Clerk of Court is directed to terminate the pending motion at docket entry 42.

SO ORDERED.

Dated: July 16, 2026
New York, New York

KATHERINE POLK FAILLA
United States District Judge